signals were exchanged the pilot of the North-western turned her bow to the larboard, and when the Superior came up alongside he kept her as nearly steady as possible. As the Superior commenced lapping on, the course of the Northwestern was again changed a little to larboard, which brought the barge in front of the Superior's wheel. The Superior did not slacken her speed after she gave the signal to pass, but kept right on and put herself in such near proximity that the gradual holding of the bow of the Northwestern to larboard when the Superior was abreast, rendered the collision unavoidable.

Conclusions.—It was the duty of the Superior to have exercised very great precaution when she gave the signal to pass on the Missouri side, which was stony and sandy at the point where the collision took place, particularly as there was plenty of room and water on the larboard side of the Northwestern. Under the 17th article of the act of congress of April 29, 1864 [13 Stat. 58], it was her duty to keep out of the way of the Northwestern, and if she desired to pass to the starboard when the Northwestern was heading for a landing on that side, less than one-fourth of a mile distant, she took the chances of there being sufficient and safe navigation to permit her passage under the circumstances. The 8th rule for the government of pilots which took effect January 1st, 1872, reads as follows: Rule 8th: "When steamers are running in the same direction, and the pilot of the boat which is astern shall desire to pass either side of the boat ahead, he shall give the signal as in rule 1, (viz.: one sound of the whistle to keep to the right, and two sounds to keep to the left,) and the pilot of the boat ahead shall answer by the same signal, or if he prefer to keep on his course, he shall make the necessary signals, and the boat wishing to pass must govern herself accordingly, but the boat ahead shall in no case attempt to cross her bow or crowd upon her course." This rule has reference in its application to the circumstances under which a passage is made. The boat ahead must not crowd or attempt to cross the bow of the boat astern, yet the latter boat must keep out of the way, and be governed in her efforts to pass so as to avoid a collision.

The signal of the Superior when answered gave her the right to pass to the starboard, and governed the pilot of the Northwestern in the management of his vessel, but the 8th rule when interpreted in the light of the 17th, 18th, 19th and 20th articles of the act of congress, of April 20th, 1864 [supra], cannot excuse bad management on the part of the Superior, or the neglect of any proper precaution on the part of her officers. The Superior thus attempting to pass to starboard suffered the vessels to get into dangerous proximity, and was in fault. The Northwestern was not justified in holding her bow to the larboard when she found the Superior was passing. The character of the shore and bottom of the river

on the starboard side, and her position should have prevented a favorable answer to the signal of the Superior, but when the pilot had given the starboard side to her, he should not have executed the movement he did by porting the helm just as the Superior came abreast. The sudden turn of the bow was a faulty movement, and cannot be excused. It contributed to bring about the collision, and there was no emergency that demanded it.

The vessel towing the barge being equally at fault there can be no recovery in these suits, and the libels must be dismissed. Decrees accordingly.

---

ST. PAUL FIRE & MARINE INS. CO. (SIBLEY v.). See Case No. 12,830.

ST. PAUL WATER CO. (WARE v.). See Case No. 17,172.

---

## Case No. 12,245.

### The ST. THOMAS.

[Cited in Treat v. The Rainbow. Case No. 14,-161. Nowhere reported; opinion not now accessible.]

---

## Case No. 12,246.

SALA et al. v. NEW ORLEANS et al.

[2 Woods. 188.] [1]

Circuit Court, D. Louisiana. Nov. Term, 1875.

CONSTITUTIONAL LAW — ACTS IMPAIRING OBLIGATIONS OF CONTRACTS — CITY BONDS — CORPORATIONS—STOCKOWNERS.

1. The charter of a bank authorized it to construct water-works for the city of New Orleans, and declared that after the expiration of thirty-five years, it should be lawful for the city to purchase said water-works on certain prescribed terms, and pay for them in its bonds, and the bank was, on the election of the city to purchase, required to sell on the terms prescribed: Held that this charter was a contract with the bank and that any act of the legislature afterwards passed imposing onerous conditions upon the issue of bonds by the city, so far as they might apply to bonds to be issued in payment for the water-works, impaired the obligation of the contract with the bank and was void.

2. Where the contract for the purchase of the water-works was executed and the city got the water-works and paid its bonds to the bank therefor, and the city did not deny its obligation to pay the bonds, nor threaten to do so, the bank could not repudiate the contract of sale on account of any supposed infirmity in the bonds.

3. The city having authority to issue the bonds, they are good in the hands of bona fide holders for value, whether the conditions precedent to their issue were observed by the city or not.

4. Therefore, parties holding only a portion of the bonds issued by the city in payment for the water-works could not undertake to repudiate the contract of sale without the consent of all the other holders of such bonds.

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]